***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award of the Deputy Commissioner. The Full Commission enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Travelers Insurance Company was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff's alleged date of injury is 13 November 2001.
5. Plaintiff's average weekly wage was $677.92, which yields a compensation rate of $451.97 per week.
6. The parties stipulated the following medical records into evidence of record at the hearing before Deputy Commissioner Dollar:
(a) Stipulated Exhibit #1 — I.C. Forms
(b) Stipulated Exhibit #2 — plaintiff's medical records consisting of the records of Dr. Kenneth Banks, four pages; Dr. William F. Lestini, sixteen pages; Dr. Robert Littleton, one page; Dr. Hale Stephenson, five pages; Dr. James Taylor, six pages; Dr. Pamela Whitney, five pages; NC Urological Associates, Inc., five pages; ProActive Therapy, Inc., four pages; Raleigh Community Hospital, thirty-two pages; and Raleigh Urgent Care Center, PA, seven pages.
7. Judicial Notice was taken by the Deputy Commissioner of the following:
a. I.C. Forms 18 (two), 19, 33, 33R, and Calendar for March 2002.
8. The parties entered the following into the evidence of record at the hearing before the Deputy Commissioner:
(a) Plaintiff's Exhibit #1 — photos
(b) Plaintiff's Exhibit #2 — 2002 calendar
(c) Plaintiff's Exhibit #3 — work excuse note
(d) Plaintiff's Exhibit #4 — phone record
(e) Plaintiff's Exhibit #5 — out of work note
(f) Plaintiff's Exhibit #6 — phone call message
(g) Plaintiff's Exhibit #7 — work excuse note
(h) Plaintiff's Exhibit #8 — work excuse note
(i) Plaintiff's Exhibit #9 — work excuse note
(j) Plaintiff's Exhibit #10 — work excuse note
(k) Defendants' Exhibit #1 — medical note
9. The issues for determination by the Commission are whether plaintiff sustained an injury by accident arising out of and in the course of her employment with defendants on 14 March 2002; did defendants wrongfully accuse plaintiff of falsifying a doctor's note; and is plaintiff entitled to have reinstatement of medical and compensation benefits related to her admittedly compensable injury.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a fifty-four year old female, who has been employed for 19 and 1/2 years by defendants. She completed her G.E.D. She had prior work experience as a seamstress and on the toaster/mixer assembly line for Hamilton Beach.
2. Plaintiff has treated with her family physician, Dr. Kenneth Banks, for depression and anxiety since 1999, for which he prescribed Prozac for these conditions. Dr. Banks also treated her for arthritic back complaints since October of 2001. Dr. Banks found plaintiff's condition to be normal for a person of her age and activity level. She had a number of prior surgeries, including a hysterectomy and two bladder tacks.
3. In November 2001, plaintiff worked in the area building doors, where she moved galvanized steel doors to install hinges, handles, labels, main plates, latch assemblies and wire assemblies. The doors weighed seventy pounds before the assembly process. Some doors had a specialized box mounted on the door. Two people generally lifted the doors. Plaintiff worked on first shift, and reported to work at 7:00 a.m.
4. Under the employer's attendance policy, employees are required to call the supervisor or Human Resources prior to the start of the work shift if they will not be reporting for work. They must bring in a doctor's note for absences. Under this policy, employees will be terminated for failure to report for duty for two days without excuse, and all employees are aware of this provision of the attendance policy.
5. Plaintiff admitted she was familiar with defendants' attendance policy.
6. On 13 November 2001, plaintiff sustained an injury by accident when she fell from a three-step ladder, striking her back and right arm, and landing on her buttocks.
7. Under the employer's workers' compensation policy, an employee reports the injury and an incident report is completed in-house. The Human Resources Department notifies the insurance carrier and the carrier contacts the employee. If there are work restrictions, Gabrielle Miller, employer's benefits representative, confers with the injured employee's supervisor to determine if work is available within the employee's restrictions. Injured workers bring their doctor's work restrictions and out-of-work notes to Ms. Miller, per the company policy.
8. Defendants referred plaintiff to Raleigh Urgent Care Center, where Dr. Allen Mask saw her. Following examination, Dr. Mask diagnosed plaintiff with a right arm contusion, mechanical back strain and a coccyx contusion. He restricted plaintiff to light duty work with a ten pound lifting restriction and limited right hand use.
9. Plaintiff returned to work on 14 November 2001 and provided the light duty note to her supervisor, Christine Bearsley. Plaintiff returned to her regular job and defendants accommodated her restrictions. They accepted compensability for plaintiff's injuries as a "medical only" claim and paid for her medical treatment. However, plaintiff did not have any lost time from work other than the time for medical appointments.
10. Between 13 November 2001 and 31 December 2001, Dr. Mask saw plaintiff seven times for the contusions and back strain. By 10 December 2001, Dr. Mask discontinued the light duty work restrictions. Dr. Mask ordered physical therapy. Eventually, Dr. Mask referred plaintiff to orthopedic surgeon Dr. William Lestini of Triangle Spine and Backcare Center.
11. On 7 January 2002, Gary Tate, PA-C, examined plaintiff, at which time plaintiff reported falling backward from a three-step stepladder, landing on a cement floor and striking her right arm, mid back and buttocks. Plaintiff reported immediate low back pain and bruising in the mid back and severe pain down her left leg. Mr. Tate diagnosed plaintiff with degenerative disc disease at L5-S1 and degenerative disc disease of the L5-S1 facet joint. Diagnostic studies were ordered. Mr. Tate authorized plaintiff to return to light duty work with temporary restrictions of no lifting over twenty-five pounds, no frequent bending or stooping, and posture changes every thirty minutes until diagnostic studies could be obtained.
12. A lumbar MRI on 5 February 2002 was reported as normal, with the exception of mild facet changes at L4-5 and L5-S1. Dr. William F. Lestini ordered additional studies of the hips to rule out structural lesion, and he continued the work restrictions until 21 February 2002. After reviewing diagnostic studies, Dr. Lestini diagnosed plaintiff with chronic and progressive low back and left leg pain of unknown etiology.
13. By 22 February 2002, the carrier notified the plaintiff and the Commission of the assignment of Teresa L. Roberts, R.N., to perform telephonic medical case management.
14. On 1 March 2002, plaintiff's new supervisor David Teeter assigned her to work in the file room, where she filed blueprints, cards and models for the engineers to reference in manufacturing orders.
15. On 4 March 2002, Mr. Tate examined plaintiff, at which time she reported a marked increase in severity of the left lateral hip pain protruding through the vagina. The previously ordered bone scan was reported as normal. Mr. Tate ordered an OB/Gyn examination to rule out hydrocele. He provided plaintiff with a medical excuse for the appointment for her to take to work. The note listed her light duty restrictions.
16. Plaintiff took Mr. Tate's excuse to Gabrielle Miller on 4 March 2002. However, the note plaintiff gave to Ms. Miller also indicated plaintiff was to have no work from 4 March to 12 March 2002.
17. On 5 March 2002, plaintiff telephoned her employer at 8:44 a.m. to advise she would not be in to work. This was after the start of her shift. In addition to failing to give timely notice that she would not be reporting for duty at 7:00 a.m., plaintiff did not have a valid medical excuse for this absence.
18. On 6 March 2002, plaintiff sought an evaluation with Dr. Hale Stephenson of Greenville OB/Gyn. Dr. Stephenson did not find any hydrocele or any other problem causally related to the fall at work. Further, he noted plaintiff had no abnormal gait and had no difficulty getting on the examination table or moving from sitting to lying down and back up to sitting during the course of his examination. Dr. Stephenson did not authorize plaintiff to remain out of work. Further, he advised her that any gynecological problem was not related to her fall at work.
19. Plaintiff did not notify defendants on 6 March 2002 she would not be in for work, and she had no medical excuse for the absence.
20. At some point after receiving the 4 March 2002 and 8 March 2002 medical notes, Gabrielle Miller spoke with Ms. Roberts about her restrictions. During the course of their conversation, Ms. Roberts indicated her note was different than that which Ms. Miller had. Ms. Miller faxed the note, which plaintiff had brought in on 4 March, and after comparing the two, Ms. Roberts told her the note from plaintiff had been altered. Ms. Miller then took the notes to Ms. Clark, and they met with Business Unit Manager Matt Dionne.
21. Plaintiff did not report to work on 7 March 2002, or call to notify defendants she would not be in to work. At the hearing before the Deputy Commissioner, plaintiff testified she was nauseated and too sick to call in to work or have anyone call in on her behalf. However, despite being this ill, she did not seek any medical treatment.
22. Plaintiff was scheduled to work at 7:00 a.m. on 8 March 2002. Plaintiff did not telephone defendants until 2:01 p.m. to advise then she would not be in to work. At the hearing before Deputy Commissioner Dollar, she testified she had told Ms. Bearsley, her former supervisor, she had an appointment with a urologist prior to another appointment. However, she did not inform Mr. Tetter of the appointment after he became her supervisor on 1 March 2002. Plaintiff had no reason to believe Ms. Bearsley would have told Mr. Tetter of the appointment, as it was not her responsibility to do so.
23. Mr. Tate provided plaintiff with a medical excuse on 8 March 2002, which indicated she would be temporarily out of work on 11 and 12 March 2002 for medical appointments.
24. After Ms. Miller received the 8 March 2002 note, she contacted Dr. Lestini's office, to confirm that what was written on the note was in fact what the doctor had issued.
25. On 11 March 2002, Dr. Pamela Whitney performed nerve conduction studies. Mr. Tate reviewed the testing and gave her a note after the 13 March 2002 appointment authorizing her to return to light duty work.
26. The employer prepared an I.C. Form 19 on 15 February 2002, listing plaintiff had sustained multiple physical injuries only. The Form 19 was scanned into the Commission's electronic document file on or about 15 March 2002, in accordance with the Act.
27. On 14 March 2002, plaintiff was called in to work at approximately 9:30 a.m. and she returned to the file room to work. At approximately 1:30 p.m., her supervisor called her to report to the Human Resources Department to meet with manager Janice Clark.
28. Plaintiff met with Gabrielle Miller, Ms. Clark and Matt Dionne regarding medical notes from Dr. Lestini's office, which appeared to be altered. When presented with the notes, plaintiff told them she did not see any differences in the documents.
29. Following the 14 March 2002 meeting, Mr. Dionne escorted plaintiff to retrieve her keys. As they proceeded, plaintiff collapsed to the floor, landing on her hip, then side, and to the office floor, in a controlled fall. Plaintiff did not slip, trip or fall, within the meaning of the Workers' Compensation Act. Emergency medical technicians responded to the office area. A first responder found plaintiff's pupils were not dilated. Plaintiff did not have a seizure or strike her head.
30. On 18 March 2002, Ms. Clark telephoned plaintiff to notify her that the employer was terminating her effective 14 March 2002, due to violation of the attendance policy.
31. By letter dated 19 March 2002, Dr. Lestini terminated the doctor-patient relationship with plaintiff "due to substantial evidence that you (plaintiff) altered a document originating from my office."
32. By 23 April 2002, plaintiff returned to Dr. Lestini after the CT scan of the hip, abdomen and pelvis, all of which were negative. In reviewing all of the diagnostic studies ordered for plaintiff, Dr. Lestini found no evidence of stenosis, herniation or impingement, and the discs were all well hydrated. Dr. Lestini found plaintiff reached maximum medical improvement, and there was no structural reason to issue any restrictions or any permanent impairment rating. Therefore, he released her to full duty.
33. Plaintiff did not retain any permanent impairment to her back, coccyx or right arm as a result of the compensable injury of 13 November 2001.
34. During his deposition, Dr. Lestini pointed out the differences between his original medical note and the altered medical note.
35. Throughout the course of her treatment with Dr. Lestini and Mr. Tate, plaintiff did not voice any complaints about anxiety, depression or any psychological concerns.
36. On or about 19 March 2002, plaintiff through her attorney prepared an I.C. Form 18, which noted as the nature of injury back, right hand and anxiety. Plaintiff filed a second Form 18 on or about 11 April 2002 which listed injuries as right arm, back, head, left leg, and psychological, and which also listed the 14 March 2002 alleged date of injury.
37. In her hearing testimony before Deputy Commissioner Dollar, plaintiff explained that she was unable to see any differences at the 14 March 2002 meeting because she did not have her glasses on. However, when shown the notes at the hearing before Deputy Commissioner Dollar, plaintiff reviewed them, as well as a number of other exhibits, without wearing glasses. Based upon this conduct at the Deputy Commissioner hearing, plaintiff's testimony is specifically rejected as not credible. In addition, despite testifying on direct examination she had given the 4 March 2002 note to Ms. Miller, on cross-examination, plaintiff stated she must have left the note on Ms. Miller's desk and she had no idea who had changed the note. This testimony was rejected by the Deputy Commissioner as not being credible. The Full Commission finds based upon the greater weight of the credible evidence, plaintiff had the 4 March 2002 out of work note in her possession until she gave it to defendants, and the evidence does not establish that defendants altered it in any way. Plaintiff did not initially react to the alteration of the note in a manner to indicate she suspected defendants changed the note. The Full Commission finds it is more likely than not that the note was changed while still in plaintiff's possession.
38. Following her termination, plaintiff sought treatment from Dr. Banks for anxiety and panic attacks on two occasions in March of 2002.
39. On 23 September 2002, approximately five weeks before the hearing before Deputy Commissioner Dollar, plaintiff was involved in a motor vehicle accident, in which her car was hit in the side. Plaintiff was taken to the hospital by ambulance, after she passed out.
40. Rather than return to Dr. Banks, plaintiff began treating with family practitioner Dr. James Taylor between 13 June 2002 and 24 January 2003, for anxiety, panic disorder, syncope and memory loss. She had normal EKG and EEG studies. Dr. Taylor noted plaintiff's syncopal episodes were likely due to anxiety. After the 23 September 2002 motor vehicle accident, plaintiff also sought treatment for thoracic and low back pain and soreness. However, she did not disclose to Dr. Taylor that she had been involved in the automobile accident. Although initially Dr. Taylor believed plaintiff's problems were related to the fall at work, when he learned of the motor vehicle accident, and the additional treatment she had obtained, he offered a different opinion.
41. Dr. Taylor did not causally relate plaintiff's anxiety attack or syncopal episodes to the November 2001 fall or the 14 March 2002 incident. Dr. Taylor felt and the Full Commission finds as fact plaintiff's thoracic and low back complaints and headache symptoms are related to her 23 September 2002 motor vehicle accident.
42. After her motor vehicle accident, plaintiff sought psychological treatment from Paula Holcombe, M.A., and Dr. Gary Bachara. Based upon her complaints, Dr. Bachara diagnosed her with post-traumatic stress disorder as a result of the automobile accident. Although plaintiff did discuss her termination with Dr. Bachara, she indicated she was fired because she could not keep up with her job. Plaintiff did not discuss being fired for falsifying a medical excuse or the alleged fall on 13 March 2002.
43. Plaintiff did not experience an injury by accident on 14 March 2002. Rather, her "fall" was either a controlled fall or due to an idiopathic condition not causally related to the 13 November 2001 compensable injury.
44. Plaintiff's anxiety, depression or panic attacks are not characteristic of or peculiar to her employment, but her psychological condition is a disease of life to which the general public is equally exposed. Further, any alleged psychological problems were not caused or exacerbated by 13 November 2001 compensable injury.
45. The Full Commission finds this claim was defended upon reasonable ground.
46. Plaintiff has made no attempt to obtain other employment since her termination. Further, any inability to earn wages since 14 March 2002 was not due to the admittedly compensable medical only claim of 13 November 2001.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). While defendants admitted compensability of plaintiff's initial injury as a "medical only" claim, they did not stipulate to the extent of disability. Therefore, plaintiff bears the burden of proof to establish by competent evidence that her disability was caused by the 13 November 2001 incident.
2. To establish disability from work, plaintiff must prove that she was incapable of earning the same wages earned prior to the work-related injury in the same or other employment, and that incapacity to earn wages was caused by the work-related injury. Hendrix v. Linn-Corriher Corp.,317 N.C. 179, 345 S.E.2d 374 (1986). In the instant case, plaintiff's inability to earn wages was not due to injury she sustained on 13 November 2001, but rather was due to her termination for her failure to follow attendance policy and due to her presentation of an altered medical note in an attempt to obtain benefits under the Workers' Compensation Act.
3. If an employee is terminated from her employment for "misconduct or fault, unrelated to the compensable injury, or for which a non-disabled employee would ordinarily have been terminated . . . the employee's misconduct will be deemed to constitute a constructive refusal to perform the work provided and consequent forfeiture of benefits for lost earnings, unless the employee is then able to show that his or her inability to find or hold other employment of any kind, or other employment at a wage comparable to that earned prior to the injury, is due to the work-related disability." Seagraves v. The Austin Company ofGreensboro, 123 N.C. App. 228, 472 S.E.2d 397 (1996). In this case, plaintiff was terminated due to her failure to comply with the attendance policy and her failure to produce a valid medical excuse for her absences. This termination was in accordance with company policy. Plaintiff's failure to report for work as scheduled is deemed to constitute constructive refusal to accept suitable employment. Therefore, she is not entitled to further benefits for lost wages.
4. Where the exact nature and probable genesis of a particular injury involves complicated medical questions removed from the ordinary experience of the layperson, only a qualified expert witness can give an opinion as to the nature and cause of the injury. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980). The Commission must first determine whether the proffered expert opinion is competent before the opinion can be weighed as evidence in the case. The testimony of a medical doctor is not competent merely because it is uttered by a licensed physician. Expert opinion that rests on speculation and conjecture, or unproven facts, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of the injury. Youngv. Hickory Business Furniture, 353 N.C. 277, 538 S.E.2d 912 (2000). In the instant case, much of the medical opinion for treatment, which plaintiff sought after 14 March 2002, rests on plaintiff's inaccurate history and exaggeration of symptoms. Therefore, the opinions are specifically rejected as not sufficiently reliable to qualify as competent evidence on the nature and cause of the injury.
5. Plaintiff is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury as may be required to effect a cure, provide relief or lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-2(19). This includes the treatment by Dr. Mask, Triangle Spine and Backcare Center, and Dr. Stephenson, as well as the numerous diagnostic studies ordered by these physicians. Defendants have paid for this treatment, as part of the compensable claim.
6. In accordance with the provisions of N.C. Gen. Stat. § 97-92(a), an employer is required to file an I.C. Form 19 with the Industrial Commission within five days after the occurrence and knowledge. . . . of an injury to an employee, causing his absence from work for more than one day or charges for medical compensation exceeding the amount set by the Commission ($2000.00), or be subject to a $25.00 fine for failure to timely file the injury report. N.C. Gen. Stat. § 97-92(e). In the instant case, defendants filed the Form 19 on or about 13 March 2002, in compliance with the Act.
7. Plaintiff did not sustain an injury by accident arising out of and in the course of her employment on 14 March 2002. Therefore, she is not entitled to any benefits for this alleged incident. N.C. Gen. Stat. §97-2(6).
8. Pursuant to the provisions of N.C. Gen. Stat. § 97-88.2, any person who willfully makes a false statement or representation of a material fact for the purpose of obtaining any benefit or payment, shall be guilty of either a misdemeanor or felony (depending upon the amount of benefit received). While the evidentiary record clearly establishes plaintiff altered a medical note in an attempt to obtain benefits under the Act and likely staged a false or controlled "fall" in an attempt to secure additional benefits, a full investigation is necessary, in accordance with N.C. Gen. Stat. § 97-88.2(b).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for benefits due to her psychological condition and any injury which she alleged related to the "fall" on 14 March 2002 is, and under the law must be, DENIED.
2. Plaintiff's claim for temporary total disability benefits following her termination is, and under the law must be, DENIED.
3. Each side shall pay their own costs.
This the ___ day of May, 2004.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CS/kjd